## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL ARMFIELD, | ) | |
| | ) | |
| Petitioner, | ) | No. 17 C 3331 |
| | ) | |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| | ) | |
| CAMERON WATSON, Warden, | ) | |
| Western Illinois Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Russell Armfield, an Illinois state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the Court denies Armfield's petition [1, 8].[1] The Court declines to issue a certificate of appealability.

## Background

Kimothy Randall, Tyrene Nelson, and Armfield were all charged with the 2004 murder of Al Copeland. R. 12-1 at 1-2. Nelson confessed to his role in the homicide and implicated Armfield and Randall in his confession. *Id.* at 1. Nelson's trial was severed from Armfield and Randall's. *Id.*

A number of witnesses' testimony at Armfield and Randall's trial implicated Armfield in Copeland's murder. The most direct evidence was testimony by a friend of Copeland's named Calshaun Vinson that he saw Armfield and Nelson (both of whom he previously knew) fire the shots in the direction of Copeland's vehicle that

---

[1]     Armfield filed the same petition twice, which is in the record at R. 1 and R. 8.

1

killed Copeland. R. 12-2 at 2. Kawana Jenkins, Copeland's girlfriend, offered corroborating testimony that she saw two men shoot Copeland's car while he was driving away from her house after dropping off her and her children, and then found Copeland shot in his car. *Id.* at 2-3. Willie Williams testified that earlier on the night of Copeland's murder, he saw Nelson and Randall shoot at Copeland's car with Armfield present, but Copeland escaped. *Id.* at 4. Yakirah Robinson corroborated Williams's account. *Id.*

Randall's girlfriend Ayeshia Floyd recanted her prior statements to police and the grand jury at trial, denying any knowledge about Copeland's shooting. R. 12-16 at 86-147. But in her grand jury testimony, which was admitted as substantive evidence at trial, Floyd explained that the night of the shooting, she drove Armfield, Nelson, and Randall near the site of the shooting. R. 12-2 at 3-4, 10. She explained that Randall instructed Armfield and Nelson to "take care of business," which she understood to mean that they should shoot Copeland. *Id.* at 10. After Armfield and Nelson got out of the car, Floyd heard gunshots. *Id.* Floyd and Randall drove away and eventually picked up Armfield and Nelson. *Id.* Floyd told the grand jury that Armfield admitted to Floyd when he returned to the car that he fired his gun and Armfield complained that Nelson did not shoot until after Armfield did. *Id.*

An Assistant State's Attorney testified that he advised Floyd of her rights before questioning her after the shooting, and that he made no promises or threats in exchange for her grand jury testimony. R. 12-16 at 180-84. Two detectives likewise

testified that they did not threaten Floyd or promise her anything in exchange for her grand jury testimony. R. 12-2 at 3.

The trial court also admitted evidence that police discovered one of the guns used in Copeland's shooting in a car in which Nelson had been a passenger during a subsequent shooting outside the Cook County Jail. R. 12-2 at 6. There was no forensic evidence presented connecting Armfield to that gun.

Jury deliberations began on the evening of June 14, 2007 and ended the evening of June 15. R. 12-13 at 7. At some point during the first half of the day on June 15, the trial court provided the jury with certain transcripts they requested, including of Floyd's grand jury testimony and various courtroom proceedings. R. 12-19 at 4-11. The transcripts of courtroom proceedings provided to the jury inadvertently contained not only the witness testimony requested, but also opening statements from Nelson's separate trial. The transcript of the prosecutor's opening statement from Nelson's trial referred to Nelson's confession implicating Armfield. R. 12-1 at 8-9. Specifically, the transcript of the opening statement in Nelson's trial stated:

> ladies and gentlemen, you're also going to see a statement given to a Cook Count assistant state's attorney that was videotaped of [Nelson] confessing to shooting Al Copeland and laying out essentially the same facts that I just told you. You will see him tell you how he and his partners murdered Al Copeland in his own words.

> Now, these defendants, this defendant and his two partners, they acted as a team. [Nelson] confined to a wheelchair couldn't have done these things on his own. And these defendants were provided guns by [Nelson]. Without [Nelson's] part, they couldn't have killed Al Copeland.

R. 12-14 at 12.

3

In the middle of the afternoon on June 15, some time after the jury received the transcripts, the jury wrote the following note: "We have reached an impasse – further discussion will not change, + in fact, may cause more hostility among jury." R. 12-13 at 116; R. 12-19 at 9-12. In response to the note, the court re-instructed the jury as to their duties as jurors, including "to deliberate with a view toward reaching an agreement if you can do so without violence to individual judgment." R. 12-19 at 13. The court "ask[ed] the jurors to return to the jury room and re-commence their deliberation." *Id.* at 14.

Later that afternoon, defense counsel raised with the court the issue of whether the transcripts given to the jury earlier that day contained "not only the testimony of witnesses, but also the opening arguments of both the defense and the prosecution." *Id.* at 15. The court asked the prosecution if it knew whether this was the case, the prosecution said it did not know, and the court said, "there's your answer." *Id.* at 16-17. Defense counsel again raised the issue of whether the transcripts "contained the opening statements" during a subsequent discussion with the court, and the court said, "We're not at that bridge, and we'll reach it if we ever come to it." *Id.* at 19. In neither of these exchanges did defense counsel specifically raise with the court the fact that Nelson's confession was mentioned in the prosecutor's opening statement in Nelson's trial that defense counsel believed might have been (and, it turns out, was) provided to Armfield's jury.

A number of hours later, in the late evening of June 15, the jury reached a unanimous verdict. R. 12-13 at 7. The jury convicted Armfield of first-degree murder,

and it found Armfield not guilty of "personally discharg[ing] a firearm." R. 12-13 at 127, 129. The court later sentenced Armfield to 33 years in prison. *Id.* at 168.

On direct appeal in the Illinois Appellate Court, Armfield argued that his Sixth Amendment right to confrontation and his Fourteenth Amendment due process rights were violated when the transcript of opening statements in Nelson's trial referring to Nelson's confession was submitted to Armfield's jury during its deliberations. R. 12-3 at 4. Armfield maintained that submission of this statement to the jury ran afoul of *Bruton v. United States*, 391 U.S. 123 (1968), in which the Supreme Court held that the admission into evidence of a codefendant's statement implicating the defendant without the codefendant testifying and being subject to cross-examination violates the defendant's constitutional right to confront witnesses against him, regardless of any jury instruction to consider the statement against the codefendant only.

The Illinois Appellate Court affirmed Armfield's conviction. R. 12-1 at 14. The Illinois Appellate Court found that there was "unquestionably an error" committed by the trial court when it submitted the opening transcript from Nelson's trial to the jury. *Id.* at 11. It explained:

> The jury was allowed to read something that it was not allowed to hear at trial: the opening statements to codefendant's jury. That proscribed material included an ASA's reference to codefendant's statements implicating [Armfield], a statement that would clearly have been inadmissible against [Armfield] because codefendant did not testify.

*Id.* at 11-12. But the Illinois Appellate Court found that this error was not reversible. *Id.* at 12-13. It determined that the case was "not subject to *Bruton*" "[b]ecause the

5

State did not attempt to introduce codefendant's statement into evidence against defendant" and "[b]ecause the jury did not hear (or, more precisely, read) the substance or content of codefendant's statement." *Id.* Instead, the jury was provided with "only a reference to the confession in an . . . opening statement." *Id.*

The Illinois Appellate Court emphasized that "the jury was duly admonished that opening statements are not evidence and that each defendant should be judged on his particular evidence." *Id.* The Illinois Appellate Court relied on the Supreme Court's decision in *Richardson v. Marsh*, 481 U.S. 200 (1987), which found no *Bruton* violation where the inculpation of defendant in the codefendant's confession admitted in their joint trial was not "express[ ]" but "inferential" (*i.e.*, only clear when considered in light of other evidence) and an appropriate limiting instruction was provided to the jury. *Id.* at 208. The Illinois Appellate Court found the opening statement transcript's "mere reference to an inculpatory confession, without actual evidence, to be similarly attenuated" to the inculpation of the defendant in *Richardson*. R. 12-1 at 13. It therefore concluded that "the trial court's instruction that an opening statement is not evidence ha[d] the weight afforded to the limiting instruction in *Richardson*, rather than the discounting of limiting instructions in *Bruton* and its progeny." *Id.* Finally, and in the alternative, the Illinois Appellate Court found the error harmless "as there was ample evidence of [Armfield's] guilt." *Id.* The Illinois Supreme Court denied Armfield's petition for leave to appeal ("PLA"). R. 12-7.

After his unsuccessful direct appeal, Armfield pursued state post-conviction relief. The trial court and Illinois Appellate Court rejected his arguments (R. 12-2), and the Illinois Supreme Court denied his PLA on September 28, 2016. R. 12-12. The specific claims raised and not raised in Armfield's post-conviction filings are discussed in more detail below.

Armfield filed a timely, *pro se* 28 U.S.C. § 2254 petition in this Court on May 2, 2017. R. 8 at 1. Armfield set forth ten claims in support of his petition: (1) ineffective assistance of appellate counsel for failure to challenge the sufficiency of evidence and to prove that any shots fired by Armfield caused Copeland's death; (2) ineffective assistance of appellate counsel for failure to challenge sufficiency of guilt based on an "accountability theory" given Armfield's position that there was no evidence of causation; (3) a violation of Armfield's Sixth Amendment right to confrontation based on the submission of the transcript of opening statements in Nelson's trial to Armfield's jury; (4) prosecutorial misconduct in violation of due process based on allegedly inflammatory statements in closing argument; (5) ineffective assistance of trial counsel for failure to object to introduction of evidence of the attempted shooting of Copeland earlier on the night of his death; (6) ineffective assistance of trial counsel for failure to object to introduction of evidence of the subsequent Cook County Jail shooting from which a weapon used in Copeland's shooting was recovered; (7) ineffective assistance of trial counsel for failure to object to the admission of physical (weapons) evidence; (8) ineffective assistance of trial counsel for failure to impeach Jenkins with prior inconsistent statements; (9) ineffective assistance of trial counsel

for failure to request the redaction of portions of Floyd's grand jury testimony describing Armfield as a gang member; and (10) ineffective assistance of trial counsel on the basis of "cumulative error" committed by trial counsel and the prosecution. R. 8 at 6-11.

Respondent Cameron Watson, warden of the Western Illinois Correctional Center where Armfield currently resides, answered the petition. Watson's answer maintains that the petition should be dismissed because six of Armfield's claims (claims one, two, four, five, seven, and eight) are procedurally defaulted, three of Armfield's claims (claims three, six, and nine) were reasonably rejected by the Illinois Appellate Court, and claim ten is fairly encompassed by claims six and nine. R. 11. Following the filing of Watson's answer, counsel appeared for Armfield and filed a reply brief on his behalf (without amending Armfield's original *pro se* petition). R. 15.

## Analysis

## I. Procedural Default: Claims One, Two, Four, Five, Seven, and Eight

### A. Default

A prerequisite to this Court ordering relief on a § 2254 habeas petition is the petitioner's exhaustion of remedies available in state court. 28 U.S.C. § 2254(b)(1)(A). "[A] claim [is] procedurally defaulted when a petitioner fails to fairly present his claim to the state courts, regardless of whether he initially preserved it with an objection at the trial level." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). "To fairly present his federal claim, a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in

post-conviction proceedings." *Id.* "In Illinois, this means that a petitioner must have directly appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007).

Here, Armfield did not raise before the Illinois Appellate Court on post-conviction review either theory of ineffective assistance of appellate counsel that he raises in claims one and two of his petition. *Compare* R. 8 at 6 *with* R. 12-8 at 47-50. He also did not present three of his theories of ineffective assistance of trial counsel to the Illinois Appellate Court on direct appeal or post-conviction review: (1) claim five, for failure to object to the admission of evidence of the attempted shooting of Copeland earlier on the day of his murder; (2) claim seven, for failure to object to the admission of weapons evidence; and (3) claim eight, for failure to impeach Jenkins. *Compare* R. 12-1 *and* R. 12-8 at 18-41 *with* R. 8 at 8-10. Accordingly, all of these claims are procedurally defaulted.

Turning to claim four—Armfield's claim for prosecutorial misconduct violating due process on the basis of inflammatory statements made during closing arguments (R. 8 at 7)—Armfield did not raise this claim on direct review with the Illinois Appellate Court or the Illinois Supreme Court. R. 12-1 at 1-14; R. 12-6 at 1-17. On post-conviction review in the Illinois Appellate Court, Armfield challenged the statements made in closing argument. But he made this argument only through Sixth Amendment ineffective assistance of trial and appellate counsel claims. R. 12-8 at 33-45. A Sixth Amendment ineffective assistance claim based on counsel's failure to raise

a constitutional claim is distinct from the underlying constitutional claim. *See, e.g.*, *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). An underlying constitutional claim is therefore procedurally defaulted when only a related ineffectiveness claim was raised in the Illinois courts. *Id.* For this reason, Armfield's claim four, which alleges a violation of due process but not ineffective assistance, is procedurally defaulted.[2]

## B.    Exceptions

A procedural default can be excused "if the petitioner can show both cause for and prejudice from the default or can demonstrate that [the] failure to consider the

---

[2]    Even if this claim was not procedurally defaulted, the Court would reject it as meritless. Armfield challenges as "[i]nflammatory" and "making the case into a [s]ocial [i]ssue" the prosecutor's remarks at closing that Armfield and his codefendants created fear in the community that caused several witnesses to be reluctant to come forward and testify. R. 8 at 7; R. 12-2 at 14. Armfield emphasizes that no evidence of witness intimidation was presented at trial. R. 15 at 21. But Armfield has not shown (and indeed, does not argue (*see id.*)) that these discrete remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process"—the standard for showing a due process violation based on a prosecutor's comments in closing statement. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). When addressing Armfield's ineffective assistance claim based on these comments, the Illinois Appellate Court appropriately applied Supreme Court law to find no ineffective assistance partially in light of the jury instruction that arguments are not evidence and must be disregarded if not supported by the evidence. R. 12-2 at 15; *see Darden*, 477 U.S. at 182 (no due process violation based on comments in closing argument in part because jury was instructed "that the arguments of counsel were not evidence"). Nor has Armfield shown that the Illinois Appellate Court made an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), when it found that the prosecutor's comments were at least in part based on evidence at trial (*i.e.*, evidence that the first shooting occurred during daylight hours and was witnessed by a child). R. 12-2 at 14. And for the reasons discussed below, the Illinois Appellate Court appropriately found that, in any event, Armfield did not establish the prejudice required to demonstrate ineffective assistance "in light of the overwhelming evidence of [Armfield's] guilt." R. 12-2 at 15.

claim would result in a fundamental miscarriage of justice." *Richardson*, 745 F.3d at 272. "Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his claim." *Id.* And the fundamental miscarriage of justice exception requires a petitioner to "convince the court that no reasonable trier of fact would have found him guilty but for the error allegedly committed by the state court." *Bolton v. Akpore*, 730 F.3d 685, 697 (7th Cir. 2013).

Armfield does not even attempt to satisfy these exceptions in his briefs. Armfield has not cited any "external impediment" preventing him from raising his procedurally defaulted claims before the state courts. *See Richardson*, 745 F.3d at 272. Armfield also fails to provide the requisite "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" necessary to make out a fundamental miscarriage of justice claim. *House v. Bell*, 547 U.S. 518, 537 (2006). The Court therefore finds that no exceptions apply to excuse Armfield's procedural default of claims one, two, four, five, seven, and eight.

## II. Preserved Claims Three, Six, and Nine (and Related Claim Ten)

Because Armfield raised claims three, six, and nine through a full round of review (either on direct appeal or post-conviction), the Court addresses those claims on their merits. The Court finds that claim ten is subsumed in claims six and nine and therefore addresses it in conjunction with those claims.

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

## A.    Claim Three

Claim three raises Armfield's most significant argument—*i.e.*, his argument that submission to the jury of the opening statement transcript from Nelson's trial containing a reference to Nelson's confession constituted a violation of clearly established Supreme Court in *Bruton* applying the Sixth Amendment's Confrontation Clause, warranting relief under § 2254(d)(1). The Illinois Appellate Court rejected Armfield's Confrontation Clause argument on two bases: (1) a finding that no reversible Confrontation Clause violation occurred; and (2) a finding that any error was harmless. The Court considers each basis in turn.

### 1. Confrontation Clause Analysis

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. A "major reason underlying the constitutional confrontation rule is to give a defendant charged with [a] crime an opportunity to cross-examine the witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 406-07 (1965). This principle was at issue in *Bruton*, the primary case on which Armfield relies. In *Bruton*, the petitioner and his codefendant were tried together for an armed postal robbery. The codefendant did not take the stand, but the jury heard his full confession during a postal inspector's testimony. 391 U.S. at 124. The trial judge instructed the jury that the confession could be used as evidence against the codefendant but not against Burton. *Id.*

The Supreme Court held that the admission of the confession into evidence violated the Confrontation Clause, and that limiting instructions were incapable of curing that violation. *Id.* at 135-36. It explained that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. It continued:

> Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be

> tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Id.* at 135-36.

Applying *Bruton* to this case, the Illinois Appellate Court found that although there "was unquestionabl[] an error by the trial court," there was no *reversible* error because of key distinctions between the situation here and the situation in *Bruton*. R. 12-1 at 11-12. Namely, *Bruton* held that the *admission into evidence* of a non-testifying codefendant's *confession* that incriminated the defendant constituted a violation of the Sixth Amendment's right to confrontation. *See id.* at 12. Here, by contrast, Nelson's confession itself was not admitted into evidence during trial. Instead, an opening statement referring to that confession was provided to the jury outside of the formal evidence submission process. *See id.*

This Court agrees with the Illinois Appellate Court's distinctions of *Bruton*. Indeed, unlike in *Bruton*, Armfield's trial was properly severed from Nelson's. Armfield did not "stand[ ] accused side-by-side" with Nelson and have "powerfully incriminating extrajudicial statements [of Nelson] . . . deliberately spread before the jury" during a witness's testimony "in a joint trial" where Armfield was unable to cross-examine Nelson. *See Bruton*, 391 U.S. at 135. Nor was the jury asked to disregard certain testimony with respect to Armfield but not with respect to Nelson. *Compare id.* Instead, as the Illinois Appellate Court properly reasoned, this case is more like the Supreme Court's subsequent decision in *Richardson* declining to find a Confrontation Clause violation. 481 U.S. at 208. Like in *Richardson*, the inculpation of Armfield was "inferential" rather than direct (*see* 481 U.S. at 208): it came in a

paraphrase of a confession in an opening statement transcript referring generally to Nelson's "partners," and not referring to Armfield by name. R. 12-14 at 12.

The Supreme Court's application of *Bruton* in a subsequent case—*Frazier v. Cupp*, 394 U.S. 731 (1969)—further supports the Illinois Appellate Court's decision here. In *Frazier*, the prosecutor in opening argument summarized the confessing testimony he expected to receive from the petitioner's codefendant. *Id.* at 733-34. The State admitted "that the jury might fairly have believed that the prosecutor was referring to [the codefendant's] statement," but he "did not explicitly tell the jury that this paper was [the codefendant's] confession." *Id.* at 734. The codefendant subsequently invoked his privilege against self-incrimination and did not testify. *Id.* At the end of the trial, the court gave a general limiting instruction to the jury that it "must not regard any statement made by counsel in [its] presence during the proceedings concerning the facts of this case as evidence." *Id.*

The petitioner in *Frazier* argued that his Confrontation Clause rights were violated because "this series of events placed the substance of [the codefendant's confession] before the jury in a way that may well have been the equivalent in the jury's mind of testimony," and as in *Bruton*, "the statement added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination." *Id.* The petitioner therefore argued that, like in *Bruton*, limiting instructions could not "cure the error." *Id.*

The Supreme Court rejected these arguments, finding that "in these circumstances the limiting instructions given were sufficient to protect petitioner's

constitutional rights." *Id.* at 735. The Court highlighted four key differences between that case and *Bruton*. First, "only a paraphrase of the statement was placed before the jury." *Id.* Second, the paraphrase of the confession was introduced not through witness testimony, but through an "opening statement," and "the jury was told that the opening statement should not be considered as evidence." *Id.* Third, "the jury was not being asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial." *Id.* And fourth, "[the codefendant's] statement was not a vitally important part of the prosecution's case." *Id.* The Court therefore upheld the court of appeals's determination that the petitioner had not been denied his Sixth Amendment rights to confrontation in a way that warranted federal habeas relief. *Id.* at 737.

This case is like *Frazier* and unlike *Bruton* in each of these respects. First, only a paraphrase of Nelson's confession was placed before the jury. Second, the paraphrase did not occur during witness testimony but in an opening statement, and the jury was instructed to not consider opening statements as evidence. *See* R. 12-13 at 98 (jury instruction that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded"). Third, the jury was not asked to perform "mental gymnastics" (*Frazier*, 394 U.S. at 735) by disregarding the statement when assessing Armfield's guilt but considering it for Nelson. Instead, the trials were properly severed.

Fourth, the statement was far from "a vitally important part of the prosecution's case." *See id.* Indeed, the paraphrase did not occur during the opening statement in Armfield's trial itself as it did in *Frazier*, or at any other point in Armfield's trial. The paraphrase was therefore not part of the prosecution's case against Armfield at all.

It is true that the paraphrase here appears to have more directly referred to Nelson's confession and more directly inculpated Armfield than the paraphrase in *Frazier*. But this fact does not change the Court's analysis in light of the other close parallels between this case and *Frazier*, and in light of the context in which the statement was submitted to the jury—as a portion of one of a number of transcripts submitted to the jury for reference after the trial concluded.

As the Supreme Court made clear in *Frazier*, "inadvertent[ ]" errors often occur in trials, but only a select few amount to "reversible error unavoidable through limiting instructions." *Id.* This was not one of them. As in *Frazier*, the Illinois Appellate Court properly found the general limiting instruction given by the trial court regarding opening statements sufficient to cure any harm.

Armfield maintains that the limiting instruction that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded" (R. 12-13 at 98) may not have worked because the jury could have found the prosecutor's statement "based on the evidence." But the evidence supporting this statement—*i.e.*, Nelson's videotaped confession—was not admitted into evidence in

Armfield's trial. There was thus no evidence presented at Armfield's trial supporting this statement by the prosecutor.

Armfield also says that the trial court should have done more to correct the error once the issue of the inadvertent submission of opening statements along with witness testimony was raised by defense counsel during deliberations. But defense counsel never specifically raised with the trial court the issue of the reference to Nelson's confession being included in the transcript. The issue was raised only in general terms. And the trial court already had given the proper mitigating instruction —*i.e.*, the instruction regarding opening statements not constituting evidence. *Compare Frazier*, 394 U.S. at 734 (general instruction that statements by counsel are not evidence was sufficient).

In sum, the Court finds that the Illinois Appellate Court did not make a decision that was contrary to or unreasonably applied clearly established Supreme Court law in concluding that no reversible Confrontation Clause violation occurred. *See, e.g.*, *Evans v. Roe*, 275 F. App'x 620, 621 (9th Cir. 2008) (finding that "the California Court of Appeal's determination that there was no deprivation of the right of confrontation was also not contrary to or an unreasonable application of Supreme Court precedent" where, like here, the "paraphrase of the problematic testimony . . . placed before the jury during [an] opening statement" was distinguishable on all four bases on which the *Frazier* court distinguished *Bruton*, and "the jury . . . was instructed that statements made by counsel do not constitute evidence"). At the very least, the Supreme Court cases do not give a "clear answer . . . in [Armfield's] favor"

to the question of whether submission to the jury of the opening statement referencing Nelson's confession was reversible error, meaning that "it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

## 2. Harmlessness Determination

In any event, the Illinois Appellate Court further determined that any error was harmless. R. 12-1 at 13. And this harmlessness determination is entitled to substantial deference under § 2254(d). Armfield "must show that the state court's [harmlessness determination] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).

Here, the Court finds that the Illinois Appellate Court reasonably concluded that there was "ample evidence of [Armfield's] guilt." R. 12-1 at 13-14. This evidence included Vinson's testimony that Armfield and Nelson fired the shots at Copeland's vehicle that killed him (R. 12-2 at 2), and Jenkins's corroborating testimony about seeing two men shoot at Copeland's vehicle (*id.* at 2-3). The evidence also included Floyd's grand jury testimony that Armfield exited Floyd's car when Randall instructed him to "take care of business" and returned with a gun in hand shortly after Floyd heard gunshots, and he told Floyd he had shot his gun. *Id.* at 10-11. And it included Robinson's testimony placing Armfield at the scene of the earlier attempted shooting of Copeland, and Williams's identification of Armfield in a line-up as being present during that shooting. *Id.* at 4.

None of these witnesses' additional testimony on which Armfield focuses meaningfully undermine the strength of their testimony against him. *See* R. 12-15 at 53, 58 (Vinson testifying that he did not remember if he told the police he saw the shooters when he met with the police the night of the shooting); R. 12-15 at 70-79 (Jenkins never asked to identify Armfield); R. 12-15 at 81-91 (Williams testifying that he identified Armfield to the police as a man "standing in the alley" during the earlier shooting, but "wasn't for sure if he was with them or not"); R. 12-15 at 109 (Robinson testifying that during the earlier shooting, she wasn't sure if Armfield was on the same side of the street as Nelson and Randall).

Armfield emphasizes the jury's note on the second day of deliberations that it had reached an impasse as evidence that any error was not harmless. Armfield implies that the jury was hung before receiving the transcripts and then reached a verdict after receiving them, showing their prejudicial effect. But those are not the facts. The jury reported that it reached an impasse *after* receiving the transcripts. Then the trial court gave the renewed instruction about the jury's duty to deliberate. If was after this instruction that the jury reported making progress and ultimately reached a verdict. The Court therefore finds, in the alternative, that the Illinois Appellate Court did not make "an error well understood and comprehended in existing law" in determining that any error was harmless in light of the strength of the evidence against Armfield. *See Davis*, 135 S. Ct. at 2199.

### B. Claims Six, Nine, and Ten

In claims six and nine, Armfield asserts ineffective assistance of trial counsel—first, in failing to object to the admission of evidence related to the subsequent shooting in front of Cook County Jail (claim six), and second, in failing to redact references to Armfield's membership in a gang in Floyd's grand jury testimony submitted to the jury (claim nine). R. 8 at 9-11.

To show that counsel was ineffective, Armfield must prove (1) "deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment'"; and (2) "that the attorney's error 'prejudiced the defense.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Scrutiny of an attorney's performance is "highly deferential." *Strickland*, 466 U.S. at 689. Even "professionally unreasonable" errors do not warrant "setting aside the judgment of a criminal proceeding" if the error in question "had no effect on the judgment." *Id.* at 691.

With respect to both claims, the Illinois Appellate Court bypassed the first prong of *Strickland* and determined for purposes of the second prong that Armfield's "ineffective assistance of trial counsel claims fail because he cannot show that he was prejudiced by counsel's alleged deficient performance" in light of the substantial evidence of Armfield's guilt. R. 12-2 at 9. For the reasons already explained, the Court finds that this determination did not unreasonably apply *Strickland's* standard or make an unreasonable determination of the facts. The Illinois Appellate Court

reasonably concluded that Floyd's romantic relationship with Randall could have been easily found by the jury to explain why she recanted at trial. *Id.* at 11. And it reasonably concluded that this recantation in no way undermined Vinson's testimony that Armfield participating in shooting Copeland, Jenkins's partially corroborating testimony, and Williams's and Robinson's testimony that Armfield was at the scene of the attempted shooting of Copeland hours before Copeland's murder. *Id.* at 10-11. The Court therefore finds that claims six and nine do not present grounds for federal habeas relief. The Court further finds that Armfield's claim ten for cumulative impact fails for the same reasons. *See Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (ineffective assistance habeas claim necessarily entails "evaluat[ing] the entire course of the defense").

## III. Certificate of Appealability

Rule 11(a) of the Rules Governing § 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A habeas petitioner must make a "substantial showing of the denial of a constitutional right" to obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). This demonstration includes "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In other words, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-*

*El v. Cockrell*, 537 U.S. 322, 338 (2003). Because this Court does not believe that reasonable jurists would disagree as to its resolution of Armfield's petition, the Court declines to issue a certificate of appealability.

## Conclusion

For the foregoing reasons, this Court denies Armfield's § 2254 petition [1, 8] and declines to issue a certificate of appealability.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: November 27, 2018